**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

MID-TOWN LAUNDRY, LLC, and STATE-ALBANY
PROPERTIES, LLC,

                                                                          1:17-cv-00338 (BKS/TWD)

                                        Plaintiffs,

v.

KIMBERLY PIERCE, Executrix of the Estate of Rosalie
Donato, and JOHN DOES 1 THROUGH 10 (said names
being fictitious operators),

                                        Defendants.

_____

**Appearances:**

_For Plaintiffs:_
Gregory J. Coffey
Coffey & Associates
310 South Street
Morristown, New Jersey 07960

_For Defendant Kimberly Pierce, Executrix of the Estate of Rosalie Donato:_
James M. Reilly
Herzog Law Firm P.C.
7 Southwoods Boulevard
Albany, New York 12211

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

        This action arises from the discovery of hazardous substances in the soil and groundwater

at 1122-1124 State Street in Schenectady, New York, (the "Site" or the "Property"), a

commercial property currently owned by Plaintiffs Mid-Town Laundry, LLC and State-Albany

Properties, LLC, who have been tasked with the Site's remediation. (Dkt. No. 1). Plaintiffs filed

this contribution and indemnification action against Rosalie Donato,[1] who owned the Property from approximately 1969 to 1988 and operated a dry-cleaning business there.[2] (Dkt. No. 1, ¶ 5). Plaintiffs' Complaint seeks declaratory judgment, contribution, and response costs under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), as amended, 42 U.S.C. §§ 9607, 9613 (Counts I, II, III); and alleges state law causes of action for strict liability, restitution, contribution, common law indemnification, public nuisance, negligence, and tortious harm to property and business (Counts IV, V, VI, VII, VIII, IX, X).[3] (Dkt. No. 1). Defendant moves for summary judgment under Federal Rule of Civil Procedure 56, and Plaintiffs cross-move for partial summary judgment as to liability. (Dkt. Nos. 97, 98). The Court heard oral argument from the parties on June 14, 2021. For the reasons that follow, the parties' motions are denied.

## II.  FACTS[4]

### A.  The Site – 1122-1124 State Street

The Site, which Plaintiffs have owned since 1988, is a .22 acre commercial property "situated in an urban area [of Schenectady] with a large number of residences nearby." (Dkt. No.

---

[1] Kimberly Pierce, Executrix of the Estate or Rosalie Donato, was substituted as a Defendant following Ms. Donato's death. (Dkt. No. 88).

[2] Plaintiffs also named as defendants, "John Does one through ten." (Dkt. No. 1). At oral argument on June 14, 2021, the parties agreed that the John Doe Defendants should be dismissed. Accordingly, the John Doe Defendants are dismissed.

[3] Before her death, Rosalie Donato filed a Third-Party Complaint against Charles Padula, the sole member of the Plaintiff LLCs, and his wife, Rose Padula. (Dkt. No. 26-2). At oral argument, Defendant acknowledged that she did not intend to proceed as to the Third-Party Complaint. As Plaintiffs do not object to dismissal, the Third-Party Complaint is therefore dismissed.

[4] The facts have been drawn from: (1) the Plaintiffs' statement of material facts, (Dkt. No. 98-1), to the extent those facts are well-supported by pinpoint citations to the record; as well as (2) the exhibits attached thereto and cited therein, and the affidavits and exhibits attached to the Defendant's motion for summary judgment (Dkt. No. 97, at 4-21, 32-59), to the extent they could "be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). In considering the parties' cross-motions for summary judgment, the Court "in each case constru[es] the evidence in the light most favorable to the non-moving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621-22 (2d Cir. 2008).

99, at 33–34). Approximately seventy percent of the Site "is covered by buildings," including "two abutting structures" presently occupied by a laundromat and a Chinese restaurant; the remainder of the Site is paved. (Dkt. No. 99, at 34).

      **B.**    **Discovery of Contaminants at the Site**

      In 1997, the New York State Department of Environmental Conservation ("DEC") discovered "low levels of solvents . . . in the groundwater near" the Site and "began investigating the source of the contamination, known as the 'Brandywine Plume.'"[5] (Dkt. No. 98-2, at 194). Between 2009 and 2012, the DEC installed "40 wells . . . which were used to track down the source of the groundwater contamination," and collected soil, groundwater, and soil gas samples. (Dkt. No. 99, at 6–7; 98-2, at 194). The investigation identified two sources of the contamination, "one of which was" 1122-1124 State Street. (Dkt. No. 98-2, at 194). The record does not definitively identify the second source, but in his declaration, Defendant's expert, David Lent posits, based on his review of "a Record of Decision prepared by the New York department of Environmental Conservation . . . for the Former Marlou Formal Wear State Superfund Project," that "Marlou Formal Wear" building, "a tuxedo rental business that performed on-site dry cleaning," located at 1108 State Street in Schenectady, is the second site. (Dkt. No. 97, at 34–35). According to Lent, the DEC added Marlou Formal Wear to its registry of inactive hazardous waste sites and investigated it separately. (*Id.* at 35).

      According to the 2012 Inactive Hazardous Waste Disposal Report issued by the DEC's Division of Environmental Remediation, the investigation revealed "[c]hlorinated solvent contamination," in the groundwater and soil vapor samples, specifically, tetrachloroethylene

---

[5] A "Groundwater Contaminant Distribution Map" places the groundwater plume near the intersection of State Street and Brandywine Avenue. (Dkt. No. 97, at 43).

("PERC" or "PCE"), dichloroethane ("DCE"), and trichloroethene ("TCE").[6] (Dkt. No. 98-2, at 72). The Waste Disposal Report noted that the Site was currently used as laundromat and restaurant and that its "Historic Use(s)" included "dry cleaning facility approximately from 1965 to 1987, when the property was owned by Vincent P and/or Rosalie Donato." (*Id.*). Having determined that the Site posed "a '[s]ignificant threat to the public health or environment' and 'action [is] required,'" the "DEC Commissioner classified the Site as a Class 2 inactive hazardous waste disposal site." (*Id.* at 194 (quoting N.Y. Envtl. Conserv. Law § 27-1305(2)(b)(2)). In its "Site Record," the DEC notes that the Site "is currently being used as a restaurant and laundromat," but states that it "operated as a dry cleaning facility from approximately 1969 to 1987" and that the "dry cleaning operation used a solvent called tetrachlorethene or perc." (Dkt. No. 99-2, at 34).

## C.     The DEC's Notification of Contamination and Plaintiffs' Response

At some point prior to October 2015, the DEC notified Plaintiffs by registered mail that it had discovered "in-ground contaminants" "on various parts of the property," that it was "concerned that these contaminants would release further contaminants into the air of the property," and that it intended to take air samples at the Site. (Dkt. No. 98-2, at 36–37). Charles Padula, the sole member of the Plaintiff LLCs, testified that he had not noticed anything "environmentally" in operating the laundromat prior to receiving the registered letter from the DEC. (*Id.* at 38). On October 2, 2015 and October 26, 2015, O'Brien and Gere, an engineering firm the DEC had hired, took borings and air samples from the Site. (*Id.* at 42–43, 122).

---

[6] The DEC identified several other "Contaminants of Concern," namely, toluene, ethylbenzene, and xylene. (Dkt. No. 98-2, at 72).

By letter dated November 4, 2015, the New York Department of Health ("DOH") informed Plaintiffs that, among other things, PERC had been found in the "indoor air" of the building at the Site and that both PERC and TCE were discovered in the "soil vapor beneath the building." (*Id.* at 119). The DOH therefore recommended that "immediate and effective actions be taken to reduce inhalation exposures to site-related contaminants," such as building ventilation, increased fresh air exchanges, the installation of air filters or a "sub-slab depressurization system." (*Id.*). The DOH enclosed a copy of the laboratory data sheet regarding the air and vapor samples collected from the Site as well as several "Fact Sheets" with information on PERC and TCE.[7] (*Id.* at 120).

In a letter to Plaintiffs' attorney dated November 6, 2015, the DEC recounted the sampling results, and explained that "[t]he sampling on October 26 was performed because the sampling in the basement of the Chinese restaurant on October 2 showed very high levels of PERC." (*Id.* at 122). The DEC stated that the sampling showed "significant concentrations" of TCE and PERC "in the indoor air and basement air," and advised that Plaintiffs were required "to take immediate action . . . to reduce contaminant levels," including the installation of an air filtration unit "within 14 days of the date of this letter," which must be "maintained continuously until additional long-term measures, such as an air handling system" could be installed. (*Id.* at 122–23).

In response, Plaintiff have installed a vapor mitigation system, removed a 275-gallon oil tank, and installed and sealed new flooring and vapor barriers in certain areas of the basement. (*Id.* at 44, 146, 204–05). In total, Plaintiffs assert they have spent more than $90,000 in

---

[7] The PERC Fact Sheet states that PERC "is a manufactured chemical that is widely used in the dry-cleaning of fabrics, including clothes," "degreasing metal parts and in manufacturing other chemicals," and that it is "found in consumer products, including some paint and spot removers, water repellents, brake and wood cleaners, glues, and suede protectors." (Dkt. No. 98-2, at 163).

remediation costs and legal fees, for which they seek contribution and indemnification from Defendant, as a prior Site owner and potentially responsible party under CERCLA. (*Id.* at 154).

### D.      Prior Owners of the Site

Rosalie and Vincent Donato purchased 1122–1124 State Street in 1969; they bought the laundromat business from Hermie Friedman and bought the building from a second individual. (Dkt. No. 98-2, at 86, 100). Mr. Friedman had used the building for a dry-cleaning operation before the Donatos purchased it. (*Id.* at 101). The Donatos operated a laundromat and dry cleaners. (*Id.* at 86). On a day-to-day basis, Mr. Donato operated the business at the Site and took care of the books; Ms. Donato "had nothing to do with" the laundromat and dry-cleaning business. (*Id.* at 88, 94). Ms. Donato testified that she was not familiar with, or involved in purchasing, the solvents that were used in the dry-cleaning operation. (*Id.* at 95). She further stated she had no knowledge of whether dry-cleaning solvents were used or stored on the property or how they were disposed of. (*Id.* at 95, 101). Before her death, Rosalie Donato submitted an affidavit stating that she knew "of no spill or discharge of any drycleaning solvent or any other 'hazardous' chemical at the premises while [she and her husband] owned and operated the laundromat and building." (Dkt. No. 97, at 9).

In 1987,[8] Mieco Corporation installed a coin-operated laundromat at the Site and was running the laundromat while attempting to sell it as a business. (Dkt. No. 98-2, at 27, 29). The Donatos had discontinued the dry cleaning operation prior to Mieco's installation of the new laundromat, but they continued to own the property. (*Id.* at 30–31).

---

[8] There is some record evidence, based on Schenectady City Directories, that the Donatos "were out of the laundry business in about 1983" and there was "no laundry at 1124 State Street" until Mieco Corporation purchased the laundry business in 1987. (Dkt. No. 97, at 37). These dates are immaterial to the resolution of the present motions.

On or about June 13, 1988, Plaintiffs purchased 1122–1124 State Street from the Donatos and the laundromat business from Mieco. (*Id.* at 13, 17–18, 21–22, 30–31). At the time of purchase, there were coin operated washers and dryers, a bill changer, and soap vending equipment as well as folding tables, hot water equipment, and a boiler in 1124 State Street; 1122 State Street was vacant.[9] (*Id.* at 23–24, 28, 34). In or about 1990, Plaintiffs leased half the Site to a Chinese restaurant, which has occupied the space continuously since. (*Id.* at 35). The Padulas operated the laundromat at the premises for approximately ten years as "Midtown Laundry Center" before forming the Plaintiff LLCs. (*Id.* at 33). Plaintiffs have never run a dry cleaning business at the Site. (*Id.* at 53).

### E.    Expert Evidence

Plaintiffs submitted an expert report by Eric Raes, P.E., "a licensed Professional Engineer and a Licensed Site Remediation Professional in the State of New Jersey with expertise in groundwater and soil investigations and remediation of volatile organic compounds." (Dkt. No. 98-2, at 171). In his report, Mr. Raes opines as follows:

> Based upon the information and data collected from the extensive soil vapor and ground water sampling activities completed at the Mid-Towne Laundry Site by the New York Department of Environmental Conservation and its environmental consultant, O'Brien & Gere, the prevalent use of PCE in dry-cleaning operations, the inadequate housekeeping practices maintained by dry-cleaning operations relating to the storage, use and disposal of PCE during the relevant time period between 1969 through 1987, and other related site inspections and investigations, I conclude that the contaminants detected in the soil vapor and groundwater are the direct result of on-site historic releases and discharges of PCE and TCE caused by dry-cleaning operations conducted by Vincent P. Donato and Rosalie Donato.

---

[9] Mr. Padula testified he understood from his realtor, that the Donatos "closed the business down" at some point in 1987 and "got Mieco" to install a coin-operated laundromat "on one half of the building," and that Mieco then ran the laundromat while it was attempting to sell it as a business. (Dkt. No. 98-2, at 27–30).

(*Id.* at 171). Mr. Raes states that the air and soil vapor samples from inside the building at the

Site demonstrate "a significant source of PCE beneath the building on the Mid-Towne Laundry

Site." (*Id.* at 173). Citing "industry sources," Mr. Raes asserts that "dry-cleaning operations,

especially those that operated prior to the 1990s, used tetrachloroethene (PCE), a chlorinated

solvent designed to dissolve grease and oils from clothing that emerged in the 1950s." (*Id.* at

173). Mr. Raes further asserts that: "As a dry-cleaning operator from approximately 1969 to

1987, Vincent P. Donato and Rosalie Donato utilized PCE in their dry-cleaning operations."

(*Id.*). Regarding the mode of delivery, handling, and disposal of PERC, Mr. Raes explains:

> Historically, PCE was delivered to dry-cleaning operations in drums
> and by tanker trucks. As a dry-cleaning operator from approximately
> 1969 to 1987, Vincent P. Donato and Rosalie Donato received
> shipments of PCE in drums to store and utilize the solvent in
> connection with the dry-cleaning process. Moreover, the
> housekeeping and waste disposal practices of dry-cleaning operators
> prior to the 1990s were lax and often led to discharge and disposal
> of PCE directly into and onto the ground through releases of spent
> solvent, separator water, still bottoms, spent filters and muck, and
> lint derived from the dry-cleaning process. As a dry-cleaning
> operator from approximately 1969 to 1987, Vincent P. Donato and
> Rosalie Donato maintained housekeeping and waste disposal
> practices that led to the discharge and disposal of PCE into and onto
> the ground at the Mid-Towne Laundry Site.

(*Id.*).

Plaintiffs have also submitted an affidavit by Sally Dewes, a professional engineer with

the DEC, and Section Chief of the Division of Environmental Remediation. (Dkt. No. 99, at 2).

Dewes states: "According to DOH Guidelines, PERC is a chemical widely used in the dry-

cleaning of fabrics, including clothes." (*Id.* at 5 (citing "PERC Fact Sheet")).

Defendant has submitted an expert declaration by David Lent, a geologist, who explains

that "TCE is a first order breakdown product of PCE and the presence of TCE [and DCE] . . . at

the Site . . . provides evidence that biological degradation of PCE is occurring, not the direct

release of TCE." (Dkt. No. 97, at 36). Mr. Lent states that it is "difficult . . . to define the degradation rates of PCE into its breakdown products" and that the "presence of TCE and . . . DCE in the groundwater could be the result of a release that occurred before the Donato's [sic] owned the dry cleaning operation." (*Id.*). Mr. Lent acknowledges that "[t]he presence of PCE associated with a dry cleaning establishment is not unusual" but opines based on the "groundwater contaminant distribution map" "suggests that there may be contribution from an off-site source," and that "down-gradient groundwater concentrations appear to be comingled with the Former Marlou Formal Wear contaminant plume." (*Id.* at 36–37). Mr. Lent also takes issue with Mr. Raes' placement of the release dates "to a time frame" during the Donatos' ownership of the Site, stating that "[t]here is no way to utilize the analytical data to estimate a date or range of dates of PCE release," and that "[i]mproper handling and disposal of the dry cleaning equipment and residual solvent" when Mieco constructed the new laundromat "some time around 1987," "would have had the potential to release PCE."[10] (*Id.* at 37).  Mr. Lent also takes issue with Mr. Raes' conclusion that the Donatos' housekeeping and waste disposal practices led to the discharge of PERC, opining that "this conclusion is not supported by the data or the depositions for Charles Padula and Rosalie Donato" and that the "soil data . . . indicate a lack of significant PCE concentrations in soils at Site." (*Id.* at 38).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

---

[10] As of 1987, the Donatos still owned the Property; Mieco bought only the laundry business. (*Id.* at 37).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV.    DISCUSSION

### A.    Deficiencies in Defendant's Submissions

As a preliminary matter, the Court notes that Defendant's statement of material facts, (Dkt. No. 97, 22–24), lacks any citation to the record and thus wholly fails to satisfy the requirements of the Local Rules, rendering their motion deniable on that basis alone. See N.D.N.Y. L.R. 7.1(a)(3) (2020) ("The Statement of Material Facts shall set forth, in numbered paragraphs, a short and concise statement of each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. . . . Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."). In addition, Defendant failed to respond to all but one of Plaintiffs' statement of material facts.[11] (Dkt. No. 98-1; Dkt. No. 100). Accordingly, the Court deems "admitted any properly supported facts set

---

[11] Defendant disputes Plaintiffs' statement concerning the substitution of Ms. Pierce for Rosalie Donato to the extent it "broaden[s] this case to a claim against Ms. Pierce individually." (Dkt. No. 100, at 2).

forth in" Plaintiffs' statement of material facts that Defendant "does not specifically controvert."

N.D.N.Y. L.R. 56.1(b) (emphasis omitted).

### B.     CERCLA's Statutory Framework

Congress enacted CERCLA to promote "the timely cleanup of hazardous waste sites,"

and to place "the cost of that [cleanup] on those responsible for creating or maintaining the

hazardous condition." *Consol. Edison Co. of New York v. UGI Utils., Inc.*, 423 F.3d 90, 94 (2d

Cir. 2005) (alteration in original) (quoting *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930,

935–36 (8th Cir. 1995)). "As a remedial statute, CERCLA should be construed liberally to give

effect to its purposes." *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 514 (2d Cir. 1996), *overruled on

other grounds by New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682, 685 (2d Cir. 2003) (citing

*Schiavone v. Pearce*, 79 F.3d 248, 253 (2d Cir. 1996)). Under § 9613(f)(1) of CERCLA, "[a]ny

person may seek contribution from any other person who is liable or potentially liable under

section 9607(a) of this title, during or following any civil action under section 9606 of this title

or under section 9607(a) of this title."

To make out a prima facie case under § 9613(f)(1), a plaintiff must show that:

> (1) defendant fits one of the four classes of responsible parties
> outlined in § 9607(a); (2) the site is a facility; (3) there is a release
> or threatened release of hazardous substances at the facility; (4) the
> plaintiff incurred costs responding to the release or threatened
> release; and (5) the costs and response actions conform to the
> National Contingency Plan set up under the Act and administered
> by the EPA in order to prioritize hazardous substance release sites
> throughout the nation.

*B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir. 1992). Here, Defendant only

contests the first prong of the § 9613(f)(1) analysis—that is, whether Plaintiffs have shown that

Defendant is among the four classes of responsible parties outlined in § 9607(a). Thus, the Court confines its analysis to the first prong.[12]

### C.   Prior Owner Liability

Plaintiffs move for partial summary judgment as to threshold liability based on Defendant's status as a prior owner under § 9607(a)(2). (Dkt. No. 98-3, at 16–23). Defendant seeks summary judgment on the ground that without expert evidence, Plaintiffs cannot establish Defendant was a prior owner within the meaning of CERCLA. (Dkt. No. 97, at 25–28, 60–67).

Section 9607(a)(2) of CERCLA imposes strict liability on: "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2); *see also Town of Islip v. Datre*, 245 F. Supp. 3d 397, 417–18 (E.D.N.Y. 2017). CERCLA provides that the term "disposal" "shall have the meaning provided in section 1004 of the Solid Waste Disposal Act [42 U.S.C.A. § 6903]," 42 U.S.C. § 9601(29) (brackets in original), which defines the term "disposal" to mean "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); *see also Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 178 (2d Cir. 2003). Accordingly, to make out a prima facie case under Section 9607(a)(2), Plaintiffs must "establish that a spill, discharge, leak, etc., occurred at the time the defendants controlled the site." *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997); *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1044

---

[12] Neither party has addressed whether Plaintiffs' costs and response action conform to the National Contingency Plan or even acknowledged that element. (*See generally* Dkt. No. 98-3 (Plaintiffs' Memorandum of Law)). On that ground alone, the Court would be unable to grant Plaintiffs' request for partial summary judgment as to threshold liability on its prima facie case.

(2d Cir. 1985) ("Prior owners and operators are liable only if they owned or operated the facility 'at the time of disposal of any hazardous substance'; this limitation does not apply to current owners[.]"); *Emerson Enters., LLC v. Kenneth Crosby New York, LLC*, 781 F. Supp. 2d 166, 176 (W.D.N.Y. 2011) ("[T]o be liable [as a prior owner], a person must be an owner or operator 'at the time of disposal' of a hazardous substance.").

### 1.    Plaintiffs' Record Evidence

In their statement of material facts, Plaintiffs assert the following: "Rosalie Donato and her husband were the former owners and operators of a dry cleaning business located at the Mid-Town Laundry Site that utilized and stored [PERC and TCE] and other related chlorinated solvents on a daily basis at the Mid-Town Laundry Site from approximately 1969 to 1987." (Dkt. No. 98-1, ¶ 3). In support of these facts, Plaintiffs cite: (1) a news article from *The Daily Gazette*, (Dkt. No. 98-2, at 74–75); (2) the 2012 DEC "Inactive Hazardous Waste Disposal Report," (*id.* at 72); and (3) Rosalie Donato's deposition testimony, (*id.* at 86–87, 94–95). However, this evidence, which the Court discusses in turn below, fails to support the facts asserted.

The *Daily Gazette* article states that contamination at the Site "likely occurred in the 1970s and 80s, when a dry cleaning facility at the site used tetrachloroethene, a chemical . . . that is widely used in the dry-cleaning business" and that "[h]ousekeeping practices at the facility from 1969 to 1987" allowed the PERC "to contaminate the groundwater at the site." (*Id.* at 74–75). Plaintiffs rely on this article for the truth of the matters asserted therein. "Newspaper articles offered for the truth of the matter asserted are inadmissible hearsay." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 217 (S.D.N.Y. 2007) (citing *Jackson v. Jimino*, 506 F. Supp. 2d 105, 113 (N.D.N.Y. 2007) (collecting cases)), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Thus, the article is inadmissible hearsay and fails to raise a material issue of fact for purposes of summary judgment. *See Jenn-Ching Luo v. Town of Hempstead*, No. 06-cv-0082, 2007 WL

9706846, at *5 (E.D.N.Y. June 29, 2007)[13] ("This newspaper article relied upon by the plaintiff is hearsay, probably inadmissible [sic] at trial, and the unsworn statements contained in that article are insufficient to raise a triable issue of fact sufficient to defeat a motion for summary judgment.").

Plaintiffs also cite the DEC's 2012 Waste Disposal Report, a one-page document concerning the Site and the DEC's discovery of "[c]hlorinated solvent contamination, specifically [PCE and TCE] . . . in the groundwater and soil vapor," (Dkt. No. 98-2, at 72), in support of their assertion that the Donatos disposed of PERC and TCE at the Site at the time they owned it. The Report, however, does not identify the Donatos' dry cleaning activities as the source of the contamination. Further, while a fact-finder could infer from the Waste Disposal Report that disposal occurred prior to 2012,[14] it does not otherwise suggest when precisely the contamination occurred or a potential source of the contamination. (*Id.*). Indeed, it refers to Vincent and Rosalie Donato only once—after "Historic Use(s)," it states: "The site operated as a dry cleaning facility approximately from 1969 to 1987, when the property was owned by Vincent P and/or Rosalie Donato." (*Id.*). Thus, no fact-finder could infer from the Waste Disposal Report that PERC or TCE was disposed of at the Site during the time period that the Donatos owned it—1969 to 1987.

Finally, nothing in Ms. Donato's deposition would allow an inference that dry cleaning solvents containing PERC or TCE were disposed of at the Site during the Donatos' ownership. Ms. Donato testified that she and her husband owned a laundromat and dry cleaning business at the Site, (Dkt. No. 98-2, at 86–87), and that when they purchased it, the dry cleaning machines

---

[13] There is no parallel LEXIS citation available for this case.

[14] It appears that the contaminants were first discovered in "groundwater near the Site" in 1997, (Dkt. No. 99-2, at 6), but without more this does not allow an inference of disposal in 1987, when the Donatos last owned the property.

"were there already,"[15] (*Id.* at 108), but could provide no details regarding the operation of the

dry cleaning business as her husband, who is deceased, operated the property and she "had

nothing to do with it." (*Id.* at 87–88).[16] None of this evidence would allow a fact-finder to infer

that the Donatos disposed of PERC or TCE when they owned the property.

Hoping to overcome this evidentiary obstacle, Plaintiffs have submitted a letter from their

expert witness Eric Raes, a professional engineer. (*Id.* at 171–75). As Defendant notes, however,

this letter is unsworn and therefore inadmissible. "Courts in this Circuit have uniformly held that

unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and

cannot be used [on] a motion for summary judgment without additional affidavit support."

*Glowczenski v. Taser Int'l, Inc.*, No. 04-cv-4052, 2010 WL 1957289, at *2, 2010 U.S. Dist.

LEXIS 47269, at *6 (E.D.N.Y. May 13, 2010) (collecting cases); *Gotlin v. Lederman*, 616 F.

Supp. 2d 376, 389 (E.D.N.Y. 2009); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d

---

[15] Ms. Donato testified that they bought the laundromat and dry cleaning operation from Hermie Friedman. (Dkt. No. 98-2, at 100–01).

[16] During her deposition, Ms. Donato was unable to provide any information regarding the operation of the drycleaners:

Q        Were you ever familiar with any of the solvents that were used in the dry cleaning operations?

A        No.

Q        Were you ever involved in any of the purchasing of the solvents used in the dry cleaning—

A        No.

. . .

Q        . . . Did you ever recall seeing any drums of cleaning solvents stored on the property?

A        No. I wouldn't know what it was anyway.

Q        Did you know if there were dry cleaning solvents stored on the property?

A        No.

Q        Did you ever know how the cleaning solvents were disposed of from the dry cleaning facility?

A        No.

Q        Did you ever see any disposal of cleaning solvents at the dry cleaning facility?

A        No.

(Dkt. No. 98-2, at 95–96).

334, 352 (S.D.N.Y. 2005); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir.

2005) (explaining that, as a general matter, unsworn expert statements are inadmissible hearsay

on a motion for summary judgment) Courts have, however, found this defect "curable through

the submission of an affidavit or a declaration verifying the report's contents." *Cornell Research*

*Found., Inc. v. Hewlett–Packard Co.*, No. 01-cv-1974, 2007 WL 4349135, at *19, 2007 U.S.

Dist. LEXIS 89637, at *59–60 (N.D.N.Y. Jan. 31, 2007) (considering the plaintiffs' unsworn

expert reports on summary judgment when the plaintiffs cured the defect by submitting

declarations from the experts verifying the contents of their reports); *see also New Old Music*

*Grp., Inc. v. Gottwald*, 122 F.Supp.3d 78, 86 n.5 (S.D.N.Y. Aug. 7, 2015) (same). Here, Plaintiff

has not provided or offered to provide an affidavit from Raes confirming the opinions he

expressed in his letter. Accordingly, the Court does not consider Mr. Raes' letter.

Finally, Plaintiffs cite a number of letters from the DEC and DOH to Mr. Padula

concerning PERC. (Dkt. No. 98-1, ¶ 12). But none of this evidence provides a basis for inferring

that disposal of PERC and TCE occurred at the Site at the time the Donatos owned it. The letters

refer to suspected hazardous waste disposal at the Site, (Dkt. No. 98-2, at 6), the levels at which

they were detected, (*id.* at 12–21), and the necessity of remedial action, (*id.* at 122–21), but

provide no insight as to whether Defendant disposed of hazardous materials during ownership of

the Site.

Plaintiffs also rely on the affidavit of Sally Dewes, a professional engineer, and Section

Chief of the DEC's Division of Environmental Remediation, and the attached exhibits.[17] (Dkt.

No. 99). Defendant argues that the Court must disregard this affidavit because Plaintiffs never

---

[17] Ms. Dewes submitted the affidavit in support of the DEC's lawsuit against Plaintiffs in Supreme Court of the State of New York, Albany County seeking to compel Plaintiffs to install an effective remedial system to address the indoor air levels of PERC and TCE as well as civil penalties. (Dkt. No. 98-2, at 187–202; Dkt. No. 99, at 2–10). It does not appear that Plaintiffs retained or employed Ms. Dewes to provide expert testimony in this matter.

disclosed Ms. Dewes as an expert. (Dkt. No. 59; Dkt. No. 97 at 90). Plaintiffs do not respond to

Defendant's argument.[18] If Plaintiffs intend to offer Ms. Dewes as an expert, their April 17, 2019

disclosure, (Dkt. No. 58, at 1), was untimely as Plaintiffs' expert disclosure deadline was

November 8, 2018, at the latest. (Text Minute Entry, Nov. 8, 2018; Dkt. No. 40). And as

Plaintiffs do not offer any explanation for their untimely disclosure of an expert witness, and no

explanation is discernable from the record, the Court disregards any expert opinions contained in

Ms. Dewes' affidavit. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or

identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that

information or witness to supply evidence on a motion . . . unless the failure was substantially

justified or is harmless."); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*,

943 F. Supp. 2d 320, 329-30 (N.D.N.Y. 2013) (explaining that in analyzing whether to preclude

an expert's report under Rule 37(c)(1), courts are to consider "(1) the party's explanation for the

failure to comply with the discovery order; (2) the importance of the testimony of the precluded

witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet

the new testimony; and (4) the possibility of a continuance." (citing *Patterson v. Balsamico*, 444

F.3d 104, 117 (2d Cir. 2006))).

Preclusion, of course is a "drastic remedy" that courts "should . . . exercise[] with

caution." *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000). For this reason, the

Court considers whether Ms. Dewes' affidavit, which is based on her "personal knowledge,"

including her review of DEC and DOH records, "discussions with DEC and DOH staff and third-

parties regarding conditions at the Site, environmental data, and . . . personal observations during

---

[18] Defendant has twice objected to Ms. Dewes as an expert, (Dkt. No. 59; Dkt. No. 97, at 90), and Plaintiffs have never responded to this objection despite having a second opportunity to do so in connection with the refiled motions for summary judgment, (*see* Text Minute Entry Sept. 17, 2020).

visits to the Site," (Dkt. No. 99, at 3), may constitute proper lay witness evidence. *See, e.g., DVL, Inc. v. General Elec. Co.*, 811 F. Supp. 2d 579, 589, 591 (N.D.N.Y. 2010) (disregarding expert opinions in declaration by "long-term employee of DEC who worked on several hazardous waste sites contaminated with PCBs for which [the defendant] had . . . responsibility" because the plaintiff failed to properly disclose him as an expert, but noting that aspects of DEC employee's declarations were "proper lay witness opinion," given his "familiarity through his professional experience with [the defendant's] historical waste disposal practices"),[19] *aff'd sub nom. DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378 (2d Cir. 2012).

The majority of Ms. Dewes' affidavit contains expert opinion evidence concerning historical uses of PERC, the levels at which PERC and TCE become toxic and pose health risks, the remedial plan for the Site, and the continued risk to the individuals who may be exposed to the toxic materials at the Site. (Dkt. No. 99, at 2–10). In reaching conclusions on these issues, Dewes "offers the opinion of a highly qualified individual drawing upon [her] expertise to reach conclusions surpassing [her] own experience of the events at issue." *DVL*, 811 F. Supp. 2d at 590. For instance, Dewes states that PCE "is a chemical widely used in the drycleaning of fabrics, including clothes," and it if is "improperly stored or disposed of," PERC "may leak into groundwater or soil, and from there evaporate into the air," where it can be inhaled, and "affect a person's central nervous system, liver, kidneys, blood, immune system, and reproductive system." (Dkt. No. 99, at 5). Ordinary lay persons would have no knowledge of the historical uses of PERC, its use in dry-cleaning operations, its dissemination into the ground and air if disposed of improperly, or toxicity on inhalation. *See DVL*, 490 F. App'x at 381 (affirming

---

[19] Ultimately concluding that the plaintiff's untimely disclosure "greatly prejudice[d]" the defendants at the summary judgment stage, the court refused to consider the declarations in their entirety. *DVL*, 811 F. Supp. 2d at 591–92.

district court's conclusion that the bulk of DEC employee's testimony was properly characterized as expert, rather than lay, testimony where testimony "could not have been based on the 'reasoning processes familiar to the average person in everyday life,' since ordinary lay persons would have no knowledge of the conditions under which chemical contamination of soil can migrate from site to site" (quoting *United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005)) (internal citation omitted). Once Dewes' expert opinions are excised from her affidavit, it contains little value, as the "Site History" section is duplicative of other aspects of the record. Therefore, Dewes' affidavit does not constitute competent evidence on which Plaintiffs' summary judgment motion may be granted.

Therefore, none of the direct evidence on which Plaintiffs rely allows an inference that hazardous materials were disposed of at the time the Donatos owned the Site.

### 2.    Circumstantial Evidence

This does not end the Court's inquiry, however. The absence of direct evidence is not unusual in cases like this, where decades have passed since the contamination occurred, leaving principally circumstantial evidence. As the Second Circuit has explained:

> Each hazardous waste site is unique in its combination of commercial activities, substances present, and history. In situations like the present case, the type of evidence, be it direct or circumstantial, and its quality, is to some degree impeded by the passage of time and the lack of business records reflecting the day-to-day operations of the industries then present at the . . . Site. The available evidence of who did what at the relevant site is often dependent on inference. When determining CERCLA liability, "there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain."

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) (quoting *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001)).

Here, Defendant seeks summary judgment on the ground that without expert evidence, Plaintiffs cannot establish Defendant's liability as a prior owner. (Dkt. No. 97, at 27). But even without expert evidence, the circumstantial evidence in this case is sufficient to raise a material issue of fact as to whether Defendant disposed of PERC at the Site at the time of ownership. To begin, there is evidence that disposal of PERC occurred at the building—the DEC found PERC "in the indoor air of the basement" of 1122 State Street, as well as "in the soil vapor beneath the building," indicating "a significant PCE source beneath the building." (Dkt. No. 98-2, at 119). Further, the DEC determined that the Donatos had used PERC in their 1969 to 1987 dry cleaning operation at the Site. (Dkt. No. 99-2, at 34 ). As there is no evidence that Plaintiffs operated a dry cleaning business or used PERC at the Site, a reasonable factfinder could infer that PERC was disposed of at some point prior to June 13, 1988, the date Plaintiffs purchased the property from the Donatos. (Dkt. No. 98-2, at 17–18). *See United States v. Lawrence Aviation Indus., Inc.*, No. 06-cv-4818, 2019 WL 1259791, at *14, 2019 U.S. Dist. LEXIS 45093, at *45 (E.D.N.Y. Mar. 19, 2019) (finding there was "evidence that disposal occurred at or around the [buildings on the site]" based, among other things, the fact that "PCB contaminated soil was excavated and removed from" the site); *Iron Partners, LLC v. Mar. Admin.*, No. 08-cv-05217, 2010 WL 2871144, at *4, 2010 U.S. Dist. LEXIS 73948, at *13–14 (W.D. Wash. July 22, 2010) ("Kaiser does present circumstantial evidence that Gilmore deposited the type of material found in the debris site. The discovered debris contained the hazardous materials found on the Iron Partners Property, regardless of whether the debris was buried solely in the 1940s, solely in the 1960s, or during both time periods. Viewed in the light favorable to Kaiser, the evidence establishes an issue of fact whether Gilmore disposed of any debris in the debris site."); *Garrett Day LLC v. Int'l Paper Co.*, No. 15-cv-36, 2019 WL 6768669, at *3, 2019 U.S. Dist. LEXIS 214638, at *10

(S.D. Ohio Dec. 12, 2019) ("Michael Heitz, testified that the concrete at the site was saturated with PCB oil, and that IPC's predecessors used PCB oil in their paper machine and transformers. Given that PCBs were banned by the EPA in 1979, just a few years after IPC's predecessors sold the paper mill, it could reasonably be inferred that they 'disposed of' these hazardous substances at the site."). This evidence is thin, to be sure, but drawing all inferences in Plaintiffs' favor, a factfinder could conclude that PERC was disposed of at the Site during Defendant's period of ownership. Thus, Defendant is not entitled to summary judgment.

Plaintiffs, who seek partial summary judgment on the issue of liability, are not entitled to summary judgment either. According to Defendant, whose expert, Mr. Lent, acknowledges that PERC is commonly used in dry cleaning, (Dkt. No. 97, at 36), there was a second business in the same area of State Street that also operated a dry cleaning operation on its premises and that the DEC has identified that business as contributing to the groundwater contamination in the area, (*id*. at 35). In addition, in Mr. Lent's opinion, "there is no way to utilize the analytical data to estimate a date or range of dates of PCE release(s)." (*Id*. at 37). Finally, Defendant has submitted an affidavit by Ms. Donato stating that she knew "of no spill or discharge of any drycleaning solvent or any other 'hazardous' chemical at the premises while [she and her husband] owned and operated the laundromat and building." (*Id.* at 9). Therefore, given the circumstantial evidence presented by both sides, the question of whether there was a disposal of PERC or other hazardous materials during the Donatos' ownership is a genuine issue of fact for trial.[20]

---

[20] The Court is cognizant that the evidence on which it relies in concluding there is a factual issue as to the disposal of PERC at the time of the Donatos' ownership of the Site is weak. However, as discussed above, the summary judgment submissions in this case are very poor and would not support summary judgment for either party. Defendant's statement of material facts, (Dkt. No. 97, 22–24), lacks any citation to the record rendering her motion deniable on that basis alone. *See* N.D.N.Y. L.R. 7.1(a)(3) (2020). And, as discussed, not only did Plaintiffs fail to submit expert evidence in admissible form in a case where there is little direct evidence in light of the passage of time, they failed to submit evidence to support many of the critical facts Plaintiffs assert as true. On this record, entering summary judgment for either party would be improper. *See New York v. Moulds Holding Corp.*, 196 F. Supp. 2d 210, 218–19 (N.D.N.Y. 2002) ("On such a poor factual record, the Court declines to render summary judgment. The Court

Neither party has addressed Plaintiffs' state law claims and the Court does not address them here.

## V.      CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 97) is **DENIED**; and it is further

**ORDERED** that Plaintiffs' motion for partial summary judgment (Dkt. No. 98) is **DENIED**; and it is further

**ORDERED** that the John Doe Defendants and the Third-Party Complaint (Dkt. No. 26) are **DISMISSED**.

**IT IS SO ORDERED.**

Dated:  June 14, 2021
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge

---

is mindful that the [the plaintiff] will bear the burden of establishing that the items disposed of were hazardous wastes. It is simply not possible on the submissions of the parties to determine that the paint droppings, filters, or paint thinner contained hazardous wastes found at the site. The Court is mindful of the often difficult scientific evidence that must be presented on such an issue. Consequently, the Court exercises its discretion to deny summary judgment at this time.").